# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | |
| v. | ) | Crim. ID. No. 1908013052 |
| | ) | |
| | ) | |
| TAHA EL-ABBADI, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: February 18, 2026
Decided:  May 27, 2026

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF BE SUMMARILY DISMISSED AND POSTCONVICTION COUNSEL'S MOTION TO WITHDRAW BE GRANTED.

Diana Dunn and Matthew Bloom, Deputy Attorneys General, Department of Justice, Wilmington, Delaware.

Ralph Wilkinson, Esquire, Assistant Public Defender, Office of Defense Services, Wilmington, Delaware.

Patrick Collins, Esquire, Collins, Price & Warner, Wilmington, Delaware.

Taha El-Abbadi, James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977, *pro se*.

**O'CONNOR,** Commissioner.

This 27th day of May, 2026, upon consideration of Defendant Taha El-Abbadi's ("Defendant" or "El-Abbadi") *pro se* Motion for Postconviction Relief;[1] Defendant's second *pro se* Motion for Postconviction Relief;[2] Postconviction Counsel's Motion to Withdraw; the Affidavit of Trial Counsel;[3] the State's (first) Response to the Motion for Postconviction Relief;[4] the State's (second) Response to the Motion for Postconviction Relief;[5] Defendant's (first) Response to the State's initial Response to the Motion for Postconviction Relief;[6] Defendant's (second) Response to the State's subsequent Response to the Motion for Postconviction Relief[7] and the record in this matter, the following is my Report and Recommendation.

## I.    INTRODUCTION

Before the Court is Defendant's February 23, 2024 *pro se* Motion for Postconviction Relief ("Motion").[8] Defendant was convicted after a jury trial of Murder by Abuse or Neglect First Degree for the death of three-year-old Julian Cepeda.[9] In the Motion, Defendant raises, *inter alia*, claims of ineffective assistance

---

[1]  Docket Item ("D.I.") 48.
[2]  D.I. 69.
[3]  D.I. 74.
[4]  D.I. 75.
[5]  D.I. 76.
[6]  D.I. 77.
[7]  D.I. 88.
[8]  D.I. 48.
[9]  *El-Abbadi v. State*, 312 A.3d 169, 171 (Del. 2024).

of trial and appellate counsel, alleged constitutional rights violations, as well as a challenge to this Court's denial of requested lesser-included offense jury instructions.[10]

For the reasons that follow, I recommend Defendant's Motion be **SUMMARILY DISMISSED** as procedurally barred and/or meritless, and Postconviction counsel's Motion to Withdraw be **GRANTED**.

## II.    PROCEDURAL BACKGROUND

On August 8, 2019, Defendant was arrested by officers from the New Castle County Police Department for Child Abuse First Degree – Causing Serious Physical Injury to a Child by Abuse or Neglect, in violation of 11 *Del. C.* § 1103.[11]  The victim, three-year-old Julian Cepeda, succumbed to the fatal injuries caused by Defendant, and on March 2, 2020, the State dismissed the Child Abuse First Degree charge and indicted Defendant for Murder by Abuse or Neglect First Degree, in violation of 11 *Del. C.* § 634.[12]

On February 15, 2022,  a Superior Court jury convicted Defendant of Murder by Abuse or Neglect First Degree.[13]  On September 23, 2022, this Court sentenced Defendant to thirty years at Level V followed by two years Level III probation.[14]

---

[10] D.I. 48, p. 3-4.
[11] *State v. El-Abbadi*, Case No. 1908013052, Adult Complaint and Warrant.
[12] D.I. 3, D.I. 4.
[13] D.I. 27.
[14] D.I. 33.

On September 9, 2022, Defendant filed a Notice of Appeal in the Delaware Supreme Court ("Supreme Court").[15] In the appeal, Defendant brought two arguments, both of which were rejected. Defendant first argued this Court erroneously declined to instruct the jury on the lesser-included offenses ("LIO") of Manslaughter and Criminally Negligent Homicide.[16] On that argument, the Supreme Court concluded:

> [T]here was no evidence that would have allowed the jury rationally to find El-Abbadi not guilty of the instructed charges, Murder by Abuse or Neglect First Degree, and Murder by Abuse or Neglect Second Degree, and instead, guilty of manslaughter or criminally negligent homicide. Accordingly, the trial court did not err in declining to provide the requested LIO instructions for Manslaughter and Criminally Negligent Homicide.[17]

In his second argument, Defendant asserted this Court "violated his rights to confrontation, cross-examination, and to present a complete defense when it precluded cross-examination and testimony regarding [Meagan] Alvarez's prior neglect case."[18] Defendant argued this Court erred in limiting the cross-examination of Dr. Stephanie Deutsch and/or Meghan Alvarez by constricting his ability to explain why Meagan Alvarez delayed obtaining medical treatment for Julian after Defendant brought Julian home on August 19, 2019. He also asserted this Court

---

[15] D.I. 34.
[16] *El-Abbadi*, 312 A.3d at 181-82. This Court granted Defendant's request for a lesser-included offense jury instruction for the charge of Murder by Abuse or Neglect Second Degree. *Id.*
[17] *Id.* at 189.
[18] *Id.* at 183.

4

precluded the jury from considering whether that delay "deprived Julian of the medical treatment he needed," compromising his "right to present a complete defense."[19]

The Supreme Court rejected Defendant's second claim and concluded this Court did not abuse its discretion or commit plain error in limiting the physician's or Meghan Alvarez' testimony, noting this Court's limiting jury instruction informed the jury that Dr. Deutsch's testimony "had nothing to do with the defendant and [he] had no role in [the doctor's] interaction with Julian Cepeda at that time."[20] Defendant's arguments on direct appeal were rejected, and his conviction and sentence were affirmed.[21] On January 2, 2024, the Supreme Court issued its Mandate.[22]

On February 23, 2024, the Defendant filed this Motion and a *pro se* Motion for Appointment of Postconviction Counsel.[23] The Motion for Appointment of Postconviction Counsel was granted on May 30, 2024,[24] and on October 8, 2024, Patrick Collins, Esq. accepted the appointment of counsel.[25]

---

[19] *Id.* at 189-90. As is discussed *infra*, Defendant's claim that Julian was deprived "of the medical treatment he needed" is mere speculation, as Defendant failed to provide any credible evidence that additional or earlier medical treatment once he returned Julain home would have improved Julian's outcome or prevented his death.

[20] *Id.* at 191.

[21] *Id.* at 194.

[22] D.I. 47.

[23] D.I. 49.

[24] D.I. 52.

[25] D.I. 55.

On March 17, 2025, Mr. Collins filed a Motion to Withdraw, concluding that after "undertaking a thorough review of the record, [he was] unable to ethically advocate for any postconviction claims."[26] Mr. Collins seeks relief from any further obligation(s) in this matter.[27]

On June 5, 2025, in response to Mr. Collins' Motion to Withdraw, Defendant sought the appointment of substitute postconviction counsel,[28] and on June 17, 2025, Defendant filed a second postconviction motion.[29] On September 3, 2025, this Court received trial counsel's Affidavit,[30] and on September 29, 2025, the State submitted the first of its two responses to the Motion.[31] On November 7, 2025, this Court received Defendant's first Response to Trial Counsel's Affidavit and the State's first response to the Motion,[32] and on February 18, 2026, this Court received Defendant's second response to the State's September 30, 2025 filing.[33] As briefing has concluded, this matter is ripe for decision.

## III. FACTUAL BACKGROUND

The facts of this case, as summarized by the Delaware Supreme Court ("Supreme Court"), are as follows:

---

[26] D.I. 60, p. 4.
[27] *Id.*
[28] D.I. 67. Defendant's request was denied. See D.I. 70.
[29] D.I. 69.
[30] D.I. 74.
[31] D.I. 75. A second State's Response was received on September 30, 2025. D.I. 76.
[32] D.I. 77.
[33] D.I. 88.

## A. The Weekend and Morning Prior to Julian's Injury

On August 19, 2019, El-Abbadi had been dating Meagan Alvarez ("Alvarez"), Julian's mother, for approximately five months. He had been living with Alvarez and her two young children, Julian and J.C., for several months in the Castle Brook Apartments in New Castle. Alvarez had been working on potty-training Julian and had encountered difficulty in potty-training him during the weekend of August 17 and 18 of 2019. She testified that she "spanked [Julian's] butt with his diaper on[,]" because Julian had an accident. El-Abbadi testified that around 7:00 a.m. on August 19, 2019, he woke to screaming and yelling because Julian had wet the bed. Instead of taking Julian and J.C. to daycare that day, Alvarez brought J.C. with her to work at Great Clips, and left Julian with El-Abbadi. When she left, Julian was acting normally and had no visible marks or bruises. Surveillance footage shows Alvarez leaving with J.C. at 7:35 a.m. She did not come back until later in the day and did not reenter her apartment until 5:24 p.m..

At around 8:34 a.m., Cristian Cabrerra ("Cabrerra"), a friend of El-Abbadi, visited the apartment. The two men smoked marijuana outside and ate food that they had ordered. Meanwhile, Julian played inside on an iPad. El-Abbadi sent a picture of Julian to Alvarez around 10:23 a.m. Alvarez asked if Julian had been crying. El-Abbadi testified that he sent the picture because he was concerned about a mark on Julian's left cheek. Alvarez did not see any mark on Julian's cheek. At 10:54 a.m., El-Abbadi and Julian appear on surveillance footage exiting the apartment to head to the Casanova Auto Repair shop, where El-Abbadi was employed. They returned at 11:34 a.m. Surveillance footage showed Julian walking outside the apartment complex at 11:46 a.m.

## B. Julian's Changed Behavior

Around 12:00 p.m., El-Abbadi called his friend Lisa Velez. Although El-Abbadi testified that they discussed automobile parts, Ms. Velez testified that El-Abbadi told her that Julian fell while playing at a friend's house and would not wake up. Alvarez testified that on a Facetime call with El-Abbadi around 1:30 p.m., Julian was awake but neither spoke nor responded to her questions. Both El-Abbadi and Julian were lying on the floor during the call. El-Abbadi testified that

he told Alvarez to come get Julian due to marks on his face and buttocks.

Between 2:41 and 5:24 p.m., Alvarez ran errands between leaving work and coming home. According to El-Abbadi, he went to work at the autobody shop at about 3:00 p.m. Surveillance video from the apartment complex showed El-Abbadi carrying a limp Julian to the car around 3:00 p.m. Julian remained in the car with the air conditioning on while El-Abbadi worked. Cabrerra testified that he saw Julian in the car at the autobody shop around 5:00 or 6:00 p.m., and that Julian appeared to be asleep and had purple marks on his face. When Alvarez arrived home, she called El-Abbadi because he and Julian were not there. According to Alvarez, El-Abbadi told her that Julian had an accident at the shop and that he would tell her about it when he got home.

El-Abbadi testified that he told Alvarez that Julian fell asleep in the car and would not wake up. El-Abbadi returned with Julian at 6:15 p.m. and put him in Julian's bed. A neighbor, Kaitlyn Seese, testified that she saw El-Abbadi carrying a limp and sick-looking Julian into the building. Despite Alvarez's attempts to wake her son, Julian would not wake up. Alvarez testified that El-Abbadi told her that Julian had hit his head on a car lift. She testified that she thought Julian was sleeping because El-Abbadi had told her that he had given Julian some medicine after he hit his head. El-Abbadi testified that he urged Alvarez to call 911 rather than make the call himself because he had warrants for his arrest for pending cases. He also testified that Alvarez had created the car lift story to hide the fact that she was the person who hit and injured Julian. At around 7:51 p.m., after consulting her friend, Krista Hsu, Alvarez contacted an on-call doctor who connected her to 911. Alvarez testified that El-Abbadi begged her not to tell anyone his name because of his outstanding warrants. El-Abbadi left the apartment again around 7:44 p.m.

## C. Julian's Medical Treatment and Death

Paramedics arrived at the apartment around 8:00-8:05 p.m. Keely Warrick, the paramedic responding that evening, testified to observing Julian's pale, unresponsive appearance, slow breathing, and low heart rate. Julian's eyes were open but unresponsive. Given the gravity of

8

Julian's injury, Corporal Samantha Parsons, a State Trooper paramedic, flew with Julian to Alfred I. duPont Hospital for Children ("A.I. duPont") in a helicopter. She testified that Julian's pupils were large and unreactive, which was indicative of brain swelling. He was exhibiting symptoms of brain injury and intracranial pressure.

When Julian arrived at the hospital, he was categorized as an "alert," indicating to the hospital staff that surgeons and extra resources would be needed. The Emergency Room personnel quickly raised him from an "alert" to a "code," indicating the existence of a "life or limb threatening," situation. When describing how Julian appeared in the trauma bay, Dr. Erin Teeple, the emergency room pediatric trauma surgeon on duty that night, testified that Julian was very severely brain injured. His "pupils were fixed and dilated," he had high blood pressure, and a low heart rate. He had only the most minimal spinal reflexes remaining and his brain was swelling and herniating out of the bottom of his skull. Dr. Teeple asked Alvarez to call El-Abbadi to obtain more information about how Julian had been injured. Dr. Teeple testified that El-Abbadi told her that he and Julian "were at the auto body shop, maybe he turned to help a customer, was in some way distracted, hit his head on something metal[.]" El-Abbadi's story did not make sense to Dr. Teeple because it did not explain the severity of Julian's injuries.

In the trauma room, while doctors were examining Julian, Bernadette Clagg, a Forensic Registered Nurse in A.I. duPont's pediatric ICU unit, photographed the bruises and marks on the left side of Julian's face, on his forehead, on his cheeks, and on both buttocks. Julian was intubated with a breathing tube to aid his breathing, and required a C-collar to maintain the position of his spine and protect his spinal cord.

Pediatric neurosurgeon, Dr. Jeffery Campbell, was on call the evening of August 19, 2019 at A.I. duPont and attended to Julian when he was brought into the trauma bay by helicopter. Dr. Campbell testified as to his assessment and treatment of Julian. He stated that Julian had only a tiny bit of brain stem function and that had he survived, he likely would have been in a vegetative state.

Dr. Campbell testified about Julian's Glasgow Coma Score. The Glasgow Coma Score provides a means to assess head injuries in terms of severity. It calculates a score based upon whether a patient's eyes open, if the patient can follow commands, if the patient is verbal, has motor skills, and can respond to pain. A three is the lowest a patient can score on the Glasgow Coma chart (meaning that a patient has no neurologic function), and a fifteen is the highest. Julian scored a four out of fifteen and exhibited signs of "a devastating irrecoverable brain injury." The CAT scan showed a very large pan-hemispheric midline shift, where the brain swelling pushed the middle of his brain over significantly. Dr. Campbell also testified that it was one of the worst CAT scans and brain injuries he had seen in twenty-two years of practice. He testified that a larger hemorrhage is generally associated "with a higher, a worse trauma, more force applied to that." Dr. Campbell operated on Julian and removed a piece of his skull bone in an attempt to drain the bleeding and relieve pressure. Prior to operating, Dr. Campbell shaved Julian's head and noted additional bruising around the top of his head.

Julian survived the surgery but most of his brain was dead. Eventually, he met the criteria for brain death after he had regressed to having no brain function at all. Dr. Campbell testified that had Julian received prompt medical treatment after the initial injuries had been inflicted, he could have survived. By the time Julian arrived at the hospital, his brain had been too damaged by the secondary injury caused by his brain swelling and bleeding.

Julian was pronounced brain dead at 6:35 p.m. on August 21, 2019, and then deceased. The State medical examiner, Dr. John Krolikowski, determined that Julian's cause of death was blunt force injury, and the manner of death was homicide.

### D. El-Abbadi's Interrogation by the Police

El-Abbadi went to the police station on his own volition around 3:00 a.m. on August 20, 2019. During the investigation, El-Abbadi told the police at least four different stories to explain how Julian had been injured. The chief investigating officer, Homicide Detective Jennifer Escheman ("Detective Escheman") began interviewing El-Abbadi in the early morning hours of August 20, 2019. The first story El-Abbadi

10

told Detective Escheman was that Julian hit his head on a chassis machine at the autobody shop. El-Abbadi said that he and Alvarez had spanked Julian early that morning because Julian had wet the bed. Later that day, around 4:30 or 5:00 p.m., El-Abbadi took Julian with him to the autobody shop to get money from a customer. El-Abbadi and the customer had a disagreement, during which the customer threatened El-Abbadi. The two men had a physical altercation. El-Abbadi saw Julian run into the chassis machine and fall to the ground, hitting his head on both the chassis and the ground. Although Julian did not stand up immediately, he did cry, and was able to walk and talk. El-Abbadi took Julian to Wawa, where he purchased and gave Julian 250 mg of ibuprofen pills. El-Abbadi and Julian returned to the shop, where Julian remained in the car as El-Abbadi locked up. When El-Abbadi returned to the car, Julian was sleeping. El-Abbadi said he did not know how serious Julian's injury was.

El-Abbadi's initial interview lasted over an hour and a half. He then agreed to go to the autobody shop with police to re-enact what happened. After he repeated this story during a reenactment of the incident at the autobody shop, Detective Escheman interviewed him again on August 20 beginning at about 1:17 p.m. First, El-Abbadi recounted the initial version of the autobody shop story. The only variation was that he stated that a friend went to Wawa and purchased the juice and ibuprofen instead of him.

At that point, Detective Escheman suggested that El-Abbadi's story was inconsistent with other evidence the police collected that day. El-Abbadi then pivoted to a completely different story. He stated, "I dropped [Julian] off to somebody for a little bit 'cause [sic] I had to go do my run-arounds." He claimed that he dropped Julian off in Claymont with a woman named Brittany, and that Julian was injured when he picked him up. He did not know Brittany's last name. He dropped Julian off because a man was threatening him and accusing him of stealing the man's gun.

El-Abbadi gave another variation in which the man, "Hefea," called him and threatened him. When they left the house, the man saw him and followed him. The men had a physical altercation in which the man swung and hit Julian. Detective Escheman stated that the injury was not from being punched. El-Abbadi then stated that this man hit

11

Julian with his car. El-Abbadi admitted at least twice during this segment that Julian's "bruises on his butt is [sic] from me but everything else is not."

Detective Escheman commented that the previous stories about dropping Julian off with "Brittany" and Julian getting hit by a car could not be true. El-Abbadi pivoted again. He admitted that he got mad and spanked Julian that morning and again stated that the "bruises on his butt is [sic] from me." Then, El-Abbadi and Julian were playing with pillows. El-Abbadi said that he hit Julian "kinda hard" with a pillow, and that Julian lay on the bed, not moving. He tried to wake Julian up by putting him in the shower but that did not work. Detective Escheman told El-Abbadi that this was not a pillow injury. Then, El-Abbadi stated that when he hit Julian with the pillow Julian went flying across the floor. He took Julian to the shop when Alvarez was coming home because Julian would not wake up. When pressed for details, El-Abbadi told a different version stating that he hit Julian three times with the pillow. The first time, Julian slid off the bed in El-Abbadi's room but was laughing. The pillow fight continued into Julian's room, where El-Abbadi hit Julian too hard, and Julian hit his head on the carpeted floor. El-Abbadi said, "it's my fault" several times. He said he put ice and lotion on Julian's buttocks after he spanked him.

Detective Escheman again said that Julian was not injured by a pillow, and that this was not just a pillow fight. El-Abbadi admitted that he had been lying to Detective Escheman earlier in the interview. After Detective Escheman said that there were injuries on Julian's face. El-Abbadi then said that he "smacked" Julian's face with his hand because Julian was not listening during potty-training. Julian fell to the floor and started crying. He put cream on Julian's face. Then, the pillow fight occurred. El-Abbadi stated that when he hit Julian too hard with the pillow, Julian said "I'm ok" but then closed his eyes halfway and would not wake up. El-Abbadi then said he "freaked out" and left around 3:00 p.m. and carried Julian out.

Using a doll, Detective Escheman had El-Abbadi reenact how forcefully he hit Julian. El-Abbadi said he smacked Julian twice in the face with the pillow. The first smack was not hard because Julian was standing. But Julian hit the television and the television moved. The second smack was hard and Julian hit the floor. Julian lay in the floor

12

and closed his eyes. El-Abbadi said at the end of the interview, "it's my fault. I deserve whatever punishment you give me." He asked what his charges would be. Following this second interview, Detective Escheman placed El-Abbadi under arrest.[34]

The Supreme Court summarized the testimony of Dr. Jeffrey Campbell and Dr. Stephanie Ann Deutsch regarding their assessment of Julian's injuries. The Supreme Court explained:

> Dr. Campbell and Dr. Stephanie Ann Deutsch testified about their assessment of Julian's injuries. Dr. Campbell testified that in his training and experience, the type of subdural hematoma Julian suffered occurs because of high velocity force, such as an adult man hitting a child "with something hard." Subdural hematomas may result when children are involved in high-speed automobile accidents and are not wearing seat belts, or when children fall several stories out of a building. Multiple areas of bruising indicated that Julian was struck multiple times. Julian's injuries were inconsistent with a three-year-old child running into a structure, falling on a carpeted floor, or being in a pillow fight. Julian's body weight (thirty-three pounds) would not have been able to generate enough force in these circumstances to have caused his injuries.
>
> Due to the severity of his head injuries, it was likely that Julian would have become immediately unconscious and unresponsive. He would not have been able to walk, talk, or eat. When shown the 11:41 a.m. surveillance footage of Julian and El-Abbadi walking outside the apartment, Dr. Campbell testified that someone with such a subdural hematoma would not be able to walk independently. Dr. Campbell opined that a child who had sustained such an injury would need to be carried in a way consistent with the 6:15 p.m. apartment surveillance footage. Dr. Campbell testified that Julian's initial traumatic injury would worsen over time as the brain swelling further damaged his brain. Julian's presentation at the hospital, at around 8:00 p.m., was consistent with the injury having occurred between 12:00 and 3:00 p.m.

---

[34] *El-Abbadi*, 312 A.3d at 171-77.

13

According to Dr. Campbell, had Julian received medical intervention soon after his injury, he may have survived.

Dr. Deutsch testified about her observations of Julian the morning of August 20, 2019. Her team investigated whether Julian had experienced "child physical abuse" given the trauma to his face and buttocks. Julian had presented as a trauma code due to concerns raised by his CT scan which showed a very large intracranial hemorrhage accompanied by herniation of the brain tissue. These observations were inconsistent with a simple accidental trauma such as a fall or head strike. She opined that the pattern of bruising on his buttocks indicated that force was "highly specific for inflicted trauma."

She further testified that there were extensive hemorrhages to Julian's retinas in both eyes, and most notably a "thesis cavity formation," which indicated the severity of force applied to his head. This sort of injury occurs when there is "really extraordinary acceleration-deceleration, plus-minus some blunt impact component," such as a high-speed vehicle crash, a fatal crush injury, or a fall from a significant height. Julian's injury, according to Dr. Deutsch, was inconsistent with accidental trauma, such as hitting one's head at an autobody shop. Dr. Deutsch ultimately diagnosed Julian with abusive head trauma and opined that someone had physically abused Julian.[35]

Finally, the Supreme Court recounted Defendant's trial testimony, noting inconsistencies between the trial testimony and his August 20, 2019 statement to Detective Escheman:

Contrary to what El-Abbadi told Detective Escheman during his interrogation, El-Abbadi testified at trial to another variation of what occurred on August 19, 2019. When El-Abbadi woke to screaming and yelling at around 7:00 a.m., Julian's face was red and he did not have a diaper on because he had wet the bed. El-Abbadi testified that he told Alvarez "whatever you did, just stop doing it, it takes time and patience for the child" and he put Julian on the toilet. He testified that he told

_____

[35] *Id.* at 177-78.

14

Alvarez to take the children to day care, but she left Julian with him, and told him she would be back by 3:00 p.m. El-Abbadi also testified that he went to drop a dealer tag off from about 11:00 to 11:20 a.m.

El-Abbadi testified that when Alvarez and El-Abbadi communicated by FaceTime, he asked her to pick up Julian because Julian had marks on his face and buttocks. He took Julian with him to the shop because Alvarez had not yet returned home. That afternoon, Julian was tired, and El-Abbadi carried him because Julian did not want to walk. Julian stayed in the car watching videos while El-Abbadi worked at the shop from about 3:30 to about 5:30 or 5:40 p.m. El-Abbadi testified that Julian fell asleep on the way home from the shop, and El-Abbadi carried him inside because he would not wake up. El-Abbadi denied knowing that Julian was severely injured.

Upon arriving home, El-Abbadi put Julian to bed. He testified that he told Alvarez that "I don't know what you did that morning or weekend, you know, but you got to fix your situations," and that Alvarez created the autobody shop story. El-Abbadi testified that when she did call 911, he asked her not to give his name because of his warrants. Almost two hours passed between the time when he brought Julian home and when Alvarez called 911. El-Abbadi went to Cabrerra's house, where he smoked marijuana and drank. Early the next morning, after speaking to Detective Escheman on the phone, he went to the police station. He testified that he made up the stories during his interrogation because he did not know what to say to avoid getting into trouble. He denied injuring Julian and stated that had he known what his condition was, he would have taken Julian to the emergency room. The State cross-examined El-Abbadi regarding his relationship with Alvarez. He testified that it was "somewhat bad" and that he was going to move out. The State also cross-examined El-Abbadi in depth about his statements to Detective Escheman. El-Abbadi admitted to lying multiple times during his police interviews, but he said he was covering for Alvarez. El-Abbadi also admitted to leaving Julian alone in the apartment to retrieve drug paraphernalia from his car, and to smoking marijuana while Julian was in his care. He testified that he also smoked marijuana before his interrogation. At trial, El-Abbadi denied causing

15

the marks on Julian's buttocks, and generally denied causing any injuries to Julian.[36]

## IV.  DISCUSSION

In Delaware, "Superior Court Criminal Rule 61 provides the exclusive remedy for setting aside a final judgment of conviction."[37]  Rule 61 is "intended  to correct errors in the trial process, not to allow defendants unlimited opportunities to relitigate their convictions."[38]  It also provides incarcerated persons a procedure to seek to have a conviction set aside on the ground that the court lacked jurisdiction or to collaterally attack a conviction.

Defendant asserts, among other claims, that trial counsel provided ineffective representation.  In order to prevail on an ineffective assistance of counsel claim, a defendant must show: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[39]  "The standard for judging counsel's representation is a most deferential one,"[40] and there is a strong presumption that counsel's legal representation was competent and fell within the "wide range" of reasonable professional assistance.[41]

---

[36]  *Id.* at 178-79.
[37]  *Jackson v. State*, 2007 WL 2231072, at *1 (Del. Aug. 2, 2007).
[38]  *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[39]  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).
[40]  *Premo v. Moore,* 562 U.S. 115, 122 (2011).
[41]  *Id. at* 122-23; *see also Flamer v. State*, 585 A.2d 736, 753-44 (Del. 1990) (citations omitted).

Trial counsel "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."[42] As the Supreme Court explained in *Cooke v. State*:

> [p]roving that counsel's performance was objectively unreasonable 'has nothing to do with what the best lawyers would have done ... or even what most good lawyers would have done.' '[A] lawyer's performance is only constitutionally deficient if no competent attorney would have chosen the challenged course of action.' Where "an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options," the presumption that an attorney acted reasonably is "virtually unchallengeable."[43]

The question for this Court is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.[44] As such, mere allegations of ineffective assistance are insufficient. A defendant must make concrete allegations of ineffective assistance, and substantiate them, or risk summary dismissal.[45] Deference is given to defense counsel's judgment to promote stability in the process.[46]

To overcome the strong presumption that trial counsel provided competent representation, a defendant must demonstrate that "counsel failed to act reasonabl[y]

---

[42] *Id.*
[43] *Cooke v. State*, 2025 WL 16395 at *24 (Del. Jan. 2, 2025) (internal citations omitted).
[44] *Id.* (citing *Strickland*, 466 U.S. at 690).
[45] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[46] *State v. Fithian,* 2016 WL 3131442 at * 3 (Del. Super. May 25, 2016) (citing *Premo*, 562 U.S. at 120-122).

considering all the circumstances" and that the alleged unreasonable performance prejudiced the defense.[47] The essential question is whether counsel made mistakes so crucial that they were not functioning at the level guaranteed by the Sixth Amendment, thereby depriving defendant of a fair trial.[48]

Because a defendant must prove both parts of an ineffectiveness claim, this Court may dispose of a claim by determining that the defendant cannot establish prejudice.[49] The first consideration in the "prejudice" analysis "requires more than a showing of theoretical possibility that the outcome was affected."[50] "It is not enough to 'show that the errors had some conceivable effect on the outcome of the proceeding.'"[51] Defendant must show a reasonable probability of a different result (*i.e.*, acquittal) but for trial counsel's alleged errors.[52]

### A. Defendant's postconviction claims.

Defendant's Motion asserts five claims.[53] First, he argues, without any factual detail, that "trial counsel failed to cross-examine [a] witness that went to the heart of [his] defense."[54] Second, Defendant raises a related and likewise fact-less, claim that "the trial court violated [his] rights to confrontation, cross-examination and to

---

[47] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).
[48] *Id*.
[49] *Strickland,* 466 U.S. at 697.
[50] *Frey v. Fulcomer*, 974 F.2d 348, 358 (3rd Cir. 1992).
[51] *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693).
[52] *Strickland*, 466 U.S. at 695.
[53] D.I. 48.
[54] *Id.*, p. 3.

present a defense when it precluded cross-examination of a state witness and direct examination [of him] on an issue that went directly to the heart of his defense."[55]

Third, Defendant asserts a missing evidence claim, summarily arguing "the burden of proof falls upon the prosecution, if you are possession of the warrant for your blood, but the reports are missing and the blood vials are damaged, especially exculpatory evidence is grounds for relief, as well as prosecutorial misconduct."[56]

Fourth, Defendant asserts an ineffective assistance of appellate counsel claim. He explains, without more:

> "Appellate counsel's ineffectiveness in perfecting an appeal violated the defendant's right to effective assistance of counsel because counsel failed to preserve "viable claims of a constitutional nature and present the best possible appeal for Defendant . . .."[57]

Finally, Defendant contends "the trial court erred as a matter of law when it denied [his] request for instructions on the lesser-included offense of manslaughter and criminally negligent homicide."[58]

---

[55] *Id*.
[56] *Id*. On June 17, 2025, Defendant submitted what he labeled a second motion for postconviction relief. See D.I. 69. But in that filing, Defendant also described it as a "Rule 61 (post-conviction) Memorandum." *Id.*, p. 1 of 5. To the extent the memorandum factually supports his grounds for relief, those facts will be considered in this Court's analysis. *See* Super. Ct. Crim. R. 61(b)(2). To the extent Defendant failed to provide facts supporting his claims, those claims are subject to summary dismissal. *Id.*
[57] D.I. 48, p. 4, Ground Four.
[58] *Id*.

In Defendant's second postconviction filing, which he labeled as the "Rule 61 (post-conviction) Memorandum"[59] (hereinafter "Memorandum") he asserts additional claims. In "Ground One," Defendant suggests he was not sober during the police interview, and due to his alleged inebriation, the Detective had an obligation to stop the interrogation, take blood samples, and then re-initiate questioning at a later time when he was "sober."[60] He contends he was under the influence of some substance (presumably alcohol and marijuana), and the police should have tested a sample of his blood "in support of the admission of evidence of [his] marijuana use."[61]

In Ground Two, Defendant argues trial counsel was ineffective for failing to hire "an expert to aid his defense," and the unidentified expert "could provide trial counsel with information to 'allow' [trial counsel] to cross-examine and/or impeach the State's witnesses."[62]

In Ground Three, Defendant asserts claims of ineffective assistance of trial and appellate counsel. As to trial counsel, Defendant argues trial counsel was ineffective because he "had no intention of delving into [Meghan] Alvarez's

---

[59] D.I. 69.

[60] D.I. 69, p. 2.

[61] *Id.*, p. 3. In response to this claim, trial counsel indicates "after reviewing Defendant's statement and surrounding circumstances found no good faith basis to move to exclude his statement to the police from trial." D.I. 74, ¶ 1.

[62] D.I. 69, p. 3-4. Trial counsel denies this claim, noting he "did not hire an expert witness to testify due to the facts of the case being what they were, there would be no benefit to the defendant's case." D.I. 74, ¶ 2.

record."[63] He claims trial counsel should have confronted Alvarez by suggesting the Defendant "urged her to call 911 but that she hesitated due to her prior involvement with DFS,"[64] and trial counsel did not "follow-up with any re-cross examination."[65] Defendant also contends appellate counsel was ineffective for not arguing that the trial court or trial counsel "improperly restricted his examination of Alvarez," which he contends implicated his rights under the Confrontation Clause.[66]

In Ground Four, Defendant reasserts a claim in the Motion where he argues this Court "erred as a matter of law when it denied [his] request for instructions on the lesser included offenses of manslaughter and criminally negligent homicide...."[67]

Finally, in Ground Five, Defendant argues his trial was "fundamentally unfair" because he was "not provided an expert to aid his defense."[68] He argues, again without identifying a specific expert trial counsel should have enlisted to testify for the defense, that "it has long been the criminal justice standard to require defense counsel to expend appropriate funds to investigate the cause of a child's

---

[63] D.I. 69, p. 4.

[64] *Id.*

[65] *Id.* According to Defendant, when he returned home with Julian, he urged Meghan Alvarez "to call 911 but that she [] hesitated due to her prior involvement with D.F.S.. . .," and this delay was detrimental to providing Julian medical attention. Defendant raises this same claim in Ground Three of the June 17, 2025 Memorandum. *See* D.I. 69, p. 4-5.

    Trial counsel explained that "[Meghan] Alvarez's prior involvement with DFS was ruled off limits for trial counsel prior to trial. Trial counsel followed the clear orders given to him by the trial judge." D.I. 74, ¶ 3.

[66] D.I. 69, p. 4-5.

[67] *Id.*, Ground Five.

[68] *Id.*, p. 3.

death in order to provide effective representation by cross-examination or impeachment of adverse witnesses."[69]

## B. Application of Rule 61(i)'s Procedural Bars.

Before considering the merits of Defendant's claims, this Court must determine whether Defendant satisfied the procedural requirements of Superior Court Criminal Rule ("Rule") 61.[70] Pursuant to Rule 61(i)(1)-(4), a postconviction motion may be procedurally barred for being untimely, successive, procedurally defaulted, and/or formerly adjudicated.[71] I find while Defendant's Motion was timely filed, and it is Defendant's first postconviction motion, all of his claims except for the ineffective assistance of counsel claims (which cannot generally be raised at trial or on direct appeal)[72] are procedurally barred pursuant to Rule 61(i)(3) or procedurally defaulted pursuant to Rule 61(i)(4).[73]

---

[69] D.I. 69, p. 4.
[70] *Taylor v. State*, 32 A.3d 374, 388 (Del. 2011) (citing *Shelton v. State*, 744 A.2d 465, 474 (Del. 1999)).
[71] See Rule 61(i)(1)-(4).
[72] See *Green v. State*, 238 A.3d 160, 175 (Del. 2020); *State v. Caulk*, 2021 WL 2662250, at *5 (Del. Super. Ct. June 29, 2021). Postconviction claims asserting ineffective assistance of counsel are not generally subject to Rule 61(i)(3)'s procedural bar, as there is no opportunity to raise an ineffective assistance of counsel claim in the proceedings leading to the judgment of conviction or on direct appeal.
[73] As Defendant does not address the application of any of Rule 61(i)'s exceptions to the procedural bars to avoid the application of the procedural bars in Rule 61(i)(3) or (4), those exceptions are inapplicable.

As to the application of Rule 61(i)(3), a defendant must assert all grounds leading to the judgment of conviction prior to filing a postconviction motion, otherwise those claims are procedurally barred. Rule 61(i)(3) provides:

> **(3) Procedural default.** Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows:
> **(A)** Cause for relief from the procedural default and,
> **(B)** Prejudice from violation of the movant's rights.

I find the following claims were not raised in the proceedings leading to the judgment of conviction and are procedurally barred pursuant to Rule 61(i)(3): the claim that this Court violated his constitutional rights to Due Process and Confrontation by precluding him from examining Meghan Alvarez regarding her prior interactions with DFS to explain why she delayed in calling 911; the claim regarding the failure to preserve and test his blood sample retrieved during the initial police interview;[74] the claim that Defendant was not sober during the police interview and the police did not follow proper interview procedure; and the fundamental fairness claim – that his trial was not "fair" because he was not provided an expert to aid his defense.

Second, Rule 61(i)(4) prohibits this Court's consideration of formerly adjudicated claims. The Rule provides:

> Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a

---

[74] D.I. 48, p. 3, and D.I. 69, p. 1 (Ground One).

postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred.[75]

Thus, I likewise find Defendant's arguments relating to whether this Court should have granted the defense request for lesser-include-offense instructions for Manslaughter and Criminally Negligent Homicide,[76] as well as his claim that the Court erred in sustaining the State's objections to the examination and testimony regarding Meghan Alvarez's prior involvement with DFS, are procedurally barred pursuant to Rule 61(i)(4), as these were formerly adjudicated by the Supreme Court.[77]

And, to the extent Defendant's argument regarding the admissibility of Meghan Alvarez's reason for not calling 911 earlier differs from the argument he raises in postconviction, *i.e.*, that this Court's ruling violated his due process rights to present a complete defense and violated his Confrontation Clause rights pursuant to the U.S. and Delaware Constitutions, the result is the same. The Supreme Court rejected Defendant's newly raised argument on direct appeal, concluding Defendant's constitutional claims were unavailing.[78] Therefore, any claim regarding Meghan Alvarez's prior involvement with DFS as the reason for her delay in calling 911 remains procedurally barred pursuant to Rule 61(i)(4).

---

[75] Rule 61(i)(4).
[76] D.I. 48, p. 4, Ground Five.
[77] These claims were asserted in both the Motion (D.I. 48) and the Memorandum (D.I. 69).
[78] *See* D.I. 76 at ¶¶ 54-58; *also see El-Abbadi*, 312 A.3d at 194.

24

Finally, I find Defendant did not claim the application of any exceptions to Rule 61's procedural bars as provided in Rule 61(i)(3)(A)-(B) or Rule 61(i)(5).[79] Therefore, I recommend each of the procedurally defaulted claims be summarily dismissed as procedurally defaulted pursuant to Rule 61(i)(3) or formerly adjudicated pursuant to Rule 61(i)(4).

### C. Consideration of the merits.

For the following reasons, upon consideration of the merit of Defendant's claims, I find Defendant's Motion is meritless and recommend that all claims be summarily dismissed. Each claim will be addressed below.

1. **Ineffective Assistance of Counsel – Trial Counsel failed to Cross-Examine a Witness; Trial Court violated Defendant's Rights of Confrontation, Cross-Examination, and to Present a Defense.**

Defendant first claims "trial counsel failed to cross-examine [a] witness that went to the heart of his defense," and this Court "violated [his] rights to

---

[79] A defendant can avoid the application of the procedural bars in Rule 61(i)(1)-(4) if they can meet the exception noted with respect to the specific applicable bar, or if they can avail themselves of the exception noted in Rule 61(i)(5), which provides:

> The bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

The relevant subsections of Rule 61(d)(2)(i) and (ii) provide a defendant must either:

> (i) Plead with particularity that new evidence exists which creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or
> (ii) Plead with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.

confrontation, cross-examination and to present a defense when it precluded cross-examination of a state witness and direct examination [of him] on an issue that went directly to the heart of his defense."[80]  As to Defendant's first and second claims, although the identity of the witness and the issue he raises is initially unclear, the record supports the conclusion Defendant is referring to Meghan Alvarez, and "the issue that went to the heart of his defense" was this Court's ruling that counsel could not question her regarding her past history with DFS, explaining why she may not have called 911 sooner than she had after Defendant and Julian returned home. Upon review, trial counsel's examination of Ms. Alvarez was reasonable, Defendant's claim is factually meritless, and he cannot demonstrate prejudice.

To the extent Defendant raises an ineffective assistance of counsel claim alleging trial counsel failed to effectively cross-examine Meghan Alvarez, those decisions were for trial counsel to make and can only support a Rule 61 claim if such decisions were unreasonable.  Delaware courts have long recognized that whether to call a witness and how to cross-examine those called are both tactical decisions left to counsel's judgment alone.[81]  So long as the decision to cross-examine a witness

---

[80] D.I. 48, p. 3.
[81] *State v. Saavedra*, 2025 WL 3771270, at *8 (Del. Dec. 30, 2025) (citing *Shelton*, 744 A.2d at 479.

is made reasonably, it does not constitute a basis for a claim of ineffective assistance of counsel.[82]

As the State notes in its Response to Defendant's Motion for Postconviction Relief:

> Trial counsel's cross-examination of Ms. Alvarez was thorough and as mentioned by the Delaware Supreme Court, trial counsel questioned Ms. Alvarez about her delay in calling 911. Further, on cross-examination, she admitted that she had spanked the victim the day before the incident and that despite being concerned about her son earlier in the day, upon returning to the residence she did not check on him.[83]

The record demonstrates trial counsel's cross-examination was reasonable, and as trial counsel explained, he complied with this Court's ruling prohibiting him from questioning Ms. Alvarez regarding her past involvement with DFS. Defendant's ineffective assistance of trial counsel claim is meritless.

Next, this Court did not abuse its discretion or commit plain error in denying trial counsel's attempt to question Meghan Alvarez on her prior history with DFS. At trial, Defendant did not argue, as he did on appeal and now asserts in postconviction, that "the testimony was relevant to show that he had urged Alvarez to call 911 but that she hesitated due to her prior involvement with DFS."[84] Instead,

---

[82] *Id.*

[83] D.I. 75, p. 6. *Also see* D.I. 41, 123:9 – 16 (Alvarez spanked Julian the day before the assault); 128:9-22 (Julian came home at 6:20 p.m. and Alvarez checked on him several times but did not call 911 until 8:00 p.m.).

[84] *El-Abbadi*, 312 A.2d at 191.

trial counsel argued that "the testimony would have been relevant if Alvarez had a 'pattern of neglect' because she had denied causing Julian's injuries."[85] The Supreme Court noted that this Court "properly ruled that the probative value was less than the potential prejudice that might arise from having the 'jury to sort of extrapolate from that that she could have one, struck Julian to cause bruising, or two, obviously cause his brain injury when she wasn't present at the time."[86] This Court also "gave the jury a limiting instruction to clarify that the prior involvement with DFS referenced in Dr. Deutsch's earlier testimony had nothing to do with the defendant and the defendant had no responsibility or role in her interaction with Julian Cepeda at that time."[87] Defendant's claim is meritless.

Defendant's third related claim is that this Court violated his constitutional rights to Due Process and Confrontation by denying the defense an opportunity to cross examine Meghan Alvarez. But this Court did not prohibit trial counsel from questioning Ms. Alvarez regarding the delay in calling 911, it only limited her questioning regarding whether her prior conduct was relevant in establishing a "pattern of neglect" – because she denied causing Julian's injuries. This Court correctly held that the probative value of that line of questioning was less than the potential prejudice which could result from it.

---

[85] *Id.*
[86] *Id.*
[87] *Id.*

28

Finally, Defendant cannot establish prejudice. Defendant now asserts he should have been able to question Ms. Alvarez on why she delayed in calling 911 and suggests that "went to the heart of his defense" – that any delay could have impacted Julian's chance of recovering from his catastrophic injuries or prevented his death. But, neither result is supported by the record, nor does it exculpate Defendant from his criminal culpability for Julian's extensive injuries and death. Defendant has not offered any credible medical evidence to support his speculative theory that Julian would have not suffered a lifetime of catastrophic injuries and/or death if Meghan Alvarez called 911 sooner than she had. In fact, the record evidence proves otherwise.

Dr. Jeffrey Campbell, a board certified pediatric neurosurgeon, explained that upon arrival at Nemours Children's Hospital, Julian had a Glasgow Coma Score of 4, which meant he "exhibited a sign of a devastating irrecoverable brain injury."[88] Julian's prognosis was "very poor,"[89] and aside from "a tiny bit of brain stem function level," Julian's exam was "consistent with someone who had no neurologic function."[90] In the doctor's expert opinion, Julian "had a brain injury that he was

---

[88] D.I. 61 at A246:17 – A247:6.
[89] *Id.* at A247:19 – 21.
[90] *Id.* at A248:1 – 5.

unlikely to survive and if he survived [he] would probably be vegetative."[91]  Julian's

brain injury was "one of the worst [Dr. Campbell had] seen."[92]

At trial, the State presented several surveillance video clips from the Castle

Brook Apartment complex where Defendant, Meghan Alvarez, and Julian lived.

Video from the complex recorded on the morning of August 19th showed Julian

independently walking, something he would have been incapable of doing if he had

suffered the traumatic brain trauma discovered by Dr. Campbell's neurologic

examination.  But the video from the apartment complex at 6:15 p.m. showed

Defendant carrying a limp, unresponsive child consistent with Julian having suffered

severe brain trauma.  This, along with other medical evidence, suggested to Dr.

Campbell that Julian had been severely injured between 12:00 and 3:00 in the

afternoon, which was consistent with Julian's presentation in the emergency room

later that evening.[93]  Dr. Campbell testified that had Julian "*received immediate or

prompt medical treatment after his injury had been inflicted*," it would have been a

survivable event, but the context of that expert opinion is that the injury occurred

between 12:00 and 3:00 p.m., at least three hours before Defendant is seen on the

Castle Brook Apartments video arriving back to the complex at 6:15 p.m.  In Dr.

Campbell's expert opinion, Julian had suffered catastrophic neurologic damage three

---

[91]  *Id.* at A248:12 – 16.
[92]  *Id.* at A254:8 – 15.
[93]  *Id.* at A266:8 – 14.

or more hours earlier, and Defendant has offered no medical or other evidence that Alvarez's delay in calling 911 contributed to Julian's injuries, his treatment or eventual death, or that immediate medical intervention when Defendant arrived home with Julian at 6:15 p.m. would have changed Julian's outcome.

Defendant cannot demonstrate prejudice, and his defense is not supported by the record. The jury found El-Abbadi responsible for Julian's catastrophic injuries, and his claim that Meghan Alvarez's delay impeded Julian's prospects of recovery or contributed to his death is not supported by the record.

### 2. Missing Evidence.

Defendant next argues the interview conducted by Detective Jennifer Escheman of the New Castle County Police did not follow proper police procedure, and this failure constitutes a basis for postconviction relief. More specifically, he contends, without citation to any authority, that Detective Escheman had a duty to stop the interrogation, take a sample of Defendant's blood, and resume the questioning of him at a later time when he sobered up.[94] Defendant then suggests, that the blood sample, if recovered and tested, "would have exculpate[d] him,"[95] and the absence of a blood sample, is "missing evidence" which was somehow "destroyed."

---

[94] D.I. 69, p. 2.
[95] *Id.*

31

Defendant's claims are meritless. The detective did not have a duty to suspend the interview and she did not have an obligation to obtain a sample of Defendant's blood. Defendant has also failed to explain how the blood sample results would have been exculpatory. As noted above, Defendant sought to admit the blood test result to establish his use of marijuana on August 19, 2019.[96] To the extent Defendant claims he was not criminally liable for Julian's injuries due to his intoxicated state, he voluntarily consumed alcohol and marijuana that day, and voluntary intoxication is not a defense to a criminal act.[97]

The record reflects the New Castle County Police obtained a blood sample from Defendant after his first interview with Detective Escheman,[98] but the result from this sample was never obtained and the State did not obtain another sample to test. In fact, Detective Escheman recalled that the there was an "error at the Medical Examiner's Office on their handling of the blood test," and the police never received the result.[99] Defendant contends this evidence is "missing," and its absence constitutes "prosecutorial misconduct" and "police negligence."[100]

---

[96] *Id.*, p. 3.
[97] *See* 11 *Del. C.* § 421 ("'The fact that a criminal act was committed while the person committing such act was in a state of intoxication, or was committed because of such intoxication, is no defense to any criminal charge if the intoxication was voluntary.")
[98] D.I. 61, A110:15 – A111:23.
[99] *Id.* at A111:1 – 23.
[100] D.I. 69, p. 3.

Defendant's police interview played for the jury, and his trial testimony, established he consumed alcohol and marijuana on the morning of August 19, 2019. And, on December 23, 2021, the State filed a Motion in Limine in Support of the Admission of Evidence of Defendant's Marijuana Use,[101] which this Court granted. Evidence of Defendant's consumption of marijuana on the day Julian was critically injured was elicited through Defendant's testimony. Defendant cannot establish prejudice from the absence of a blood test result.[102] In fact, Defendant testified that prior to reporting to the New Castle County Police Department for an interview, he was "high and drunk."[103] But he later testified that he "really wasn't that high. [He] smoked a little bit, [he] didn't smoke a whole thing that day."[104] To the extent there was a discrepancy as to Defendant's consumption of marijuana or the degree to which he may have been intoxicated, the jury had ample opportunity to consider and resolve it.

The record establishes evidence of Defendant's marijuana and alcohol consumption were squarely presented to the jury.[105] Defendant cannot establish prejudice, and his claim is meritless.

---

[101] D.I. 23.
[102] D.I. 62, A688:15 – 20.
[103] *Id.*, A705:11 – A708:22.
[104] *Id.*, A720:2 – 12.
[105] D.I. 23.

33

### 3. Ineffective Assistance of Trial Counsel.

Defendant contends trial counsel was ineffective for failing to call an expert witness to aid his defense. Defendant does not identify a specific expert who should have been called, or what topic or area of expertise required expert witness testimony to support a defense.

The Supreme Court has held that whether to call a witness, and how to cross-examine those who are called, are strategic decisions.[106] "[S]trategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[107] So long as the decision to call a witness or to cross-examine a witness is made reasonably, it will not constitute a claim of ineffective assistance of counsel.[108] And here, Defendant has failed to establish trial counsel's decision not to call an expert witness was unreasonable because other than suggesting trial counsel deprived him an opportunity to enlist an expert to "aid his defense," he has not identified an expert or subject matter relevant to the defense.

---

[106] *Saavedra*, 2025 WL 3771270, at *8 (citing *Shelton*, 744 A.2d at 479).
[107] *Ploof*, 75 A.3d at 821 (quoting *Strickland*, 466 U.S. at 690-91).
[108] *Id.*

34

Defendant's claim is meritless, factually deficient pursuant to Rule 61(b)(2),[109] and he cannot establish prejudice.

### 4. Ineffective Assistance of Appellate Counsel.

Defendant next contends appellate counsel was ineffective in failing to perfect an appeal. He also claims appellate counsel failed to preserve unidentified "viable claims of a constitutional nature" and present the "best possible appeal for [him]."[110]

When considering a claim of ineffective assistance of appellate counsel, this Court applies the same *Strickland* standards discussed *infra* – a defendant must demonstrate appellate counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, but for appellate counsel's errors, the result of the appeal would have been different.[111] In this context, there is a presumption that appellate counsel's representation was professionally reasonable,[112] and a defendant must raise concrete allegations of actual prejudice and substantiate them to warrant relief.[113]

---

[109] Superior Court Criminal Rule 61(b)(2) requires a defendant to "specify all the grounds for relief which are available to [him] and of which [he] has, or by the exercise of reasonable diligence, should have knowledge, and *shall set forth in summary form the facts supporting each of the grounds this specified*." (italics added).

[110] D.I. 48, p. 4.

[111] *Ryle v. State*, 2020 WL 2188923 at *2 (Del. May 5, 2020), citing *Harris v. State*, 2018 WL 3239905, at *2 (Del. July 2, 2018) (citing *Strickland*, 466 U.S. at 687-88).

[112] *Id.* (citing *Albury v. State*, 551 A.2d 53, 59 (Del. 1988)).

[113] *Id.* (citing *Younger v. State*, 580 A.2d 552, 556 (Del. 1990)).

In addition, to establish that appellate counsel's performance was unreasonable, a defendant must also

> show that counsel failed to find arguable, nonfrivolous issues to appeal and to file a brief raising them. Appellate counsel need not raise every nonfrivolous claim, but rather may select arguments that maximize the likelihood of success on appeal. Therefore, when appellate counsel files a merits brief raising issues for consideration on appeal, a defendant who argues that counsel was ineffective for failing to raise an argument on appeal must show that the argument that was not presented was "clearly stronger" than the arguments that were presented.[114]

Defendant argues appellate counsel provided ineffective representation because they (a) failed to perfect an appeal; (b) "failed to preserve viable claims of a constitutional nature;" and (c) failed to present "the best possible appeal."

Defendant's argument is meritless. First. appellate counsel did perfect an appeal, arguing two substantive legal claims. Second, Defendant has failed to articulate a specific alternative appellate claim that should have been raised. And finally, Defendant has not asserted the existence of a viable claim that was "clearly stronger" than the arguments raised by appellate counsel. Defendant cannot demonstrate appellate counsel provided ineffective representation, and he has failed to establish prejudice.

---

[114] *Id.* (citing *Neal v. State*, 80 A.3d 935, 946 (Del. 2013)).

**5. Denial of Lesser-Included-Offense jury instructions.**

At trial, this Court considered instructing the jury on three lesser-included-offense charges:  Murder by Abuse or Neglect Second Degree, Manslaughter, and Criminally Negligent Homicide.  After considering the arguments of the State and trial counsel, this Court granted the request for a lesser-included-offense instruction on Murder by Abuse or Neglect Second Degree, but denied the two remaining requests.[115]

Defendant argues this Court erred when it denied his request for lesser-included-offense jury instructions for Manslaughter and Criminally Negligent Homicide,[116] but the Supreme Court rejected this claim on direct appeal.  An offense is a lesser-included offense of another crime when it (a) is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (b) consists of an attempt to commit the charged offense or to commit an offense otherwise included therein; and (c) involves the same result but differs from the charged offense in that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.[117]  And, this Court must also conclude there "is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting

---

[115]  D.I. 42, 3:13 – 4:21.
[116]  D.I. 48, p. 4.
[117]  *El-Abbadi*, 312 A.3d at 183-84 (*citing* 11 *Del. C.* § 206(b)).

the defendant of the included offense."[118] Defendant fails to address these elements, or explain how this Court's determination was erroneous.

Upon direct appeal, the Supreme Court concluded "there [was] no evidence that would allow the jury rationally to acquit [Defendant] of Murder by Abuse or Neglect and convict [him] of Manslaughter or Criminally Negligent Homicide.[119] Defendant does not explain how this Court erred in denying the LIO instructions on two of the three requested LIOs. This Court's denial of trial counsel's request for LIO's of Manslaughter and Criminally Negligent Homicide were correct legal determinations, and Defendant's claim is meritless.

## V. <u>**CONCLUSION**</u>

For all the aforestated reasons, I recommend the Motion for Postconviction Relief be **SUMMARILY DISMISSED**, and Postconviction Counsel's Motion to Withdraw be **GRANTED**.

**IT IS SO RECOMMENDED.**

/s/ Martin B. O'Connor
Commissioner

oc:    Prothonotary

---

[118] *Id.* (*citing* 11 *Del. C.* § 206(c)).
[119] *Id.* at 187.